Bruce P. Keller (BK-9300)                          ELECTRONICALLY FILED
Jeremy Feigelson (JF-4963)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Defendant and Third-Party/Counterclaim-Plaintiff*
*Infinity Broadcasting Corporation of Washington, D.C. n/k/a*
*CBS Radio Inc. of Washington, D.C.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

SAMUEL L. JONES JR.,                               :

        Plaintiff,                                :    No. 07 Civ. 5693 (BSJ) (AJP)

    -against-                                    :    **MEMORANDUM OF LAW**
                                                        **IN SUPPORT OF MOTION**
INFINITY BROADCASTING CORPORATION OF               :    **FOR TEMPORARY**
WASHINGTON, D.C. n/k/a CBS RADIO INC. OF                **RESTRAINING ORDER AND**
WASHINGTON, D.C.,                                  :    **PRELIMINARY INJUNCTION**

        Defendant.                                :

-----------------------------------------------------------------------x

INFINITY BROADCASTING CORPORATION OF               :
WASHINGTON, D.C. n/k/a CBS RADIO INC. OF
WASHINGTON, D.C.,                                  :

        Counterclaimant and Third-Party Plaintiff,    :

-against-                                          :

SAMUEL L. JONES JR.,                               :

        Counterclaim Defendant, and               :

RADIO ONE, INC.,
                                                   :
        Third-Party Defendant.                    x

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................1

FACTUAL BACKGROUND...........................................................................................3
    The Donnie Simpson Morning Show ................................................................3
    WPGC and Jones Make a Deal..........................................................................4
    Jones and CBS Radio Performed Under The Services Agreement For Two
        Years .........................................................................................................5

ARGUMENT ..................................................................................................................7

I.     CBS Radio MEETS THE STANDARD FOR A TEMPORARY
      RESTRAINING ORDER AND A PRELIMINARY INJUNCTION.....................7

II.    CBS Radio IS LIKELY TO SUCCEED ON THE MERITS OF ITS
      CLAIMS ................................................................................................................8
     A.     Jones Has Breached The License Agreement.............................................8
          1.     The License Agreement Is Valid and Currently In Force...............8
              a.     The April 27, 2006 Extension Notice Was Timely.............8
              b.     The Extension Was Effective Because All Parties
                    Continued to Perform Without Objection............................9
          2.     Jones's Appearance on WMMJ-FM as HUGGY
              LOWDOWN Constitutes a Material Breach of the License
              Agreement......................................................................................11
     B.     Radio One Has Tortiously Interfered With Jones's Agreement
          With CBS Radio ................................................................................12
          1.     There is a valid, legally enforceable contract between CBS
              Radio and Jones. ..........................................................................12
          2.     Radio One knew of the agreement between CBS Radio and
              Jones.............................................................................................13
          3.     Radio One's inducement of the breach of the agreement
              between CBS Radio Radio and Jones was intentional...................14
          4.     Radio One's inducement of the breach of the licensing
              agreement inflicted injury on CBS Radio......................................14

III.   CBS Radio WILL SUFFER IRREPARABLE HARM FROM THE LOSS
      OF ITS EXCLUSIVITY .....................................................................................15

IV.   CBS Radio ALSO SATISFIES THE ALTERNATE STANDARD FOR A
      TEMPORARY RESTRAINING ORDER AND PRELIMINARY
      INJUNCTION.....................................................................................................18

CONCLUSION..............................................................................................................20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alevizopoulous & Associates, Inc. v. Comcast International Holdings, Inc.*,
   100 F. Supp. 2d 178 (S.D.N.Y. 2000) ......................................................................12

*Finley v. Giacobbe*,
   79 F.3d 1285 (2d Cir. 1996) ...................................................................................13

*GMA Accessories, Inc. v. Croscill, Inc.*,
   No. 06 Civ. 6236 GEL, 2007 WL 766294 (S.D.N.Y. Mar. 13, 2007) ........................8

*H. B. Fuller Co. v. Hagen*,
   363 F. Supp. 1325 (W.D.N.Y. 1973) .......................................................................17

*Interphoto Corp. v. Minolta Corp.*,
   417 F.2d 621 (2d Cir. 1969) ...................................................................................16

*Kepner-Tregoe, Inc. v. Vroom*,
   186 F.3d 283 (2d Cir. 1999) ...................................................................................11

*LeSportsac, Inc. v. K Mart Corp.*,
   754 F.2d 71 (2d Cir. 1985) .....................................................................................18

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   454 F.3d 108 (2d Cir. 2006) .....................................................................................7

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ...................................................................................15

*Reuters Ltd. v. United Press International, Inc.*,
   903 F.2d 904 (2d Cir.1990) ....................................................................................16

*Sovereign Bus. Forms, Inc. v. Stenrite Industrial, Inc.*,
   No. 00-CIV-3867 BDP, 2000 WL 1772599 (S.D.N.Y. Nov. 28, 2000) ....................13

*Ticor Title Insurance Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999) .....................................................................................17

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
   60 F.3d 27 (2d Cir. 1995) .......................................................................................15

*Towers Finance Corp. v. Dun & Bradstreet, Inc.*,

803 F. Supp. 820 (S.D.N.Y. 1992) ..............................................................................8

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*,
155 F. Supp. 2d 1 (S.D.N.Y. 2001) ..........................................................................12

## STATE CASES

*Capital Medical System Inc. v. Fuji Medical System, U.S.A. Inc.*,
658 N.Y.S.2d 475 (N.Y. App. Div. 1997).................................................................9

*Carvel Corp. v. Noonan*,
818 N.E.2d 1100 (N.Y. 2004) ..................................................................................13

*Guard-Life Corp. v. S. Parker Manufacturing Corp.*,
406 N.E.2d 445 (N.Y. 1980) ....................................................................................14

*Kronos, Inc. v. AVX Corp.*,
612 N.E.2d 289 (N.Y. 1993) ....................................................................................12

*Loper v. O'Rourke*,
382 N.Y.S.2d 663 (N.Y. Sup. Ct. 1976) ..................................................................10

*Paddock Const., Ltd. v. Automated Swimpools, Inc.*,
515 N.Y.S.2d 662 (N.Y. App. Div. 1987).................................................................16

*Pramco III, LLC v. Partners Trust Bank*,
No. 2006/02318, 2007 WL. 1118380 (N.Y. Sup. Ct. Feb. 23, 2007) .......................11

*Scalia v. Glielmi*,
606 N.Y.S.2d 722 (N.Y. App. Div. 1994).................................................................10

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y.
2004)...........................................................................................................................9

*Watts v. Columbia Artists Management Inc.*,
591 N.Y.S.2d 234 (N.Y. App. Div. 1992).................................................................10

## STATUTES

N.Y. Gen. Constr. L. §§ 20, 58 .......................................................................................8

## OTHER AUTHORITIES

Black's Law Dictionary (8th ed. 2004). ...........................................................................................9

Infinity Broadcasting Corporation of Washington, D.C. n/k/a CBS Radio Inc. of Washington, D.C. ("CBS Radio"), submits this memorandum in support of its application, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for narrowly-tailored but immediate injunctive relief against Samuel L. Jones Jr. and Radio One, Inc. ("Radio One"). Although nominally the defendant in this action, CBS Radio is the aggrieved party because Jones and Radio One are using the trademark HUGGY LOWDOWN in violation of CBS Radio's exclusive contractual rights to that mark in connection with radio broadcasts in the Washington, D.C. area.

## PRELIMINARY STATEMENT

Several years ago, personnel of the CBS Radio station WPGC-FM ("WPGC") developed a character named HUGGY LOWDOWN and arranged for Jones to play that role on air, reading material created almost exclusively by WPGC. In the context of a subsequent dispute over rights to the HUGGY LOWDOWN name, CBS Radio and Jones cut a specific deal. Jones got a written, one-year commitment to appear on WPGC's "morning drive" show as HUGGY LOWDOWN, at a sharply increased level of pay and subject to a possible one-year renewal by CBS Radio. In return, Jones granted CBS Radio an exclusive license to use the HUGGY LOWDOWN name and mark on radio broadcasts in the Washington, D.C. area, not only for the duration of Jones's written agreement, but for a year thereafter. Jones further represented that he would never use the HUGGY LOWDOWN mark on Washington, D.C. radio for so long as WPGC's The Donnie Simpson Morning Show is broadcast. He remained free, however, to perform

- 1 -

under the name HUGGY LOWDOWN in clubs, other venues and on radio broadcasts outside the Washington, D.C. area.

For approximately two years, consistent with the License Agreement, Jones performed his obligations, appearing as HUGGY LOWDOWN exclusively on WPGC's The Donnie Simpson Morning Show.  This week, however, lured away by Radio One to a competitive station, Jones began to perform under the HUGGY LOWDOWN name on The Tom Joyner Morning Show, a nationally syndicated program that airs in the Washington, D.C. area on Radio One's station WMMJ-FM, a/k/a Majic 102.3, opposite The Donnie Simpson Morning Show.

Jones has therefore breached a crucial provision of the License Agreement depriving CBS Radio of its exclusive right to use the HUGGY LOWDOWN mark on Washington, D.C. radio for a year following the expiration of Jones' personal services agreement.  He also has violated his commitment never to use the HUGGY LOWDOWN mark on Washington, D.C. radio so long as The Donnie Simpson Morning Show remains on the air (which it does).  In turn, Radio One has contributed to these breaches by tortuously interfering with Jones's continuing contractual obligations to CBS Radio.

Both of these wrongs have caused and are causing CBS Radio irreparable harm because Jones's breaches and Radio One's tortious interference are aimed straight at the economic crown jewel of WPGC: the market-leading position of the morning drive show anchored by Donnie Simpson.  Each day that Jones performs as HUGGY LOWDOWN on the morning drive show of a direct competitor, WPGC's grip on its listener base and

advertiser relationships is threatened in ways that money damages could not begin to remedy.

At this early stage of this litigation, CBS Radio requests only the narrow remedy of an immediate injunction that prohibits Jones from performing, under the HUGGY LOWDOWN mark, on any radio broadcast that airs within the Washington, D.C. Total Survey Area until May 26, 2008.  At this time CBS Radio is not pressing – as contractually it could – for an injunction enforcing the longer-term prohibition on Jones' use of HUGGY LOWDOWN for as long as Donnie Simpson's show remains on the air. CBS Radio is limiting its request for injunctive relief in an effort to keep the current proceedings tightly focused on the immediate source of the irreparable harm.

### FACTUAL BACKGROUND

### The Donnie Simpson Morning Show

CBS Radio owns and operates WPGC-FM, a radio station in the Washington, D.C. area that broadcasts The Donnie Simpson Morning Show in the lucrative and commercially critical "morning drive" hours between 6 and 10 a.m. on weekdays.  (*See* Declaration of Samuel Rogers, July 20, 2007, ¶¶ 1, 2.)  The Donnie Simpson Morning Show consistently is, or is among, the most highly-rated of shows in its time slot. (Rogers Decl. ¶ 2.)

Beginning in or about the year 2000, WPGC added the character known as HUGGY LOWDOWN to that program.  HUGGY LOWDOWN called in to Donnie Simpson, the host of the program, and for approximately five minutes per program, discussed and commented on current celebrity or political events.  (Rogers Decl. ¶ 3.)

The HUGGY LOWDOWN concept, an irreverent "street" character who would phone in gossip and entertainment reports and banter with the studio team, was developed by CBS Radio employee Christopher Paul McMillian ("Chris Paul"), who arranged for Jones to play the character and continued to script the character throughout the time that Jones played HUGGY LOWDOWN on WPGC.  (Declaration of Christopher Paul McMillian, July 20, 2007, ¶ 3, 4; Rogers Decl. ¶ 4; Declaration of Reggie Rouse, July 20, 2007, ¶ 3-5.)

From approximately 2000 to 2007, the HUGGY LOWDOWN character became a staple feature of The Donnie Simpson Morning Show.  Throughout that time, Chris Paul wrote the material and gave Jones detailed directions about how the character should be played.  Although Jones made some creative contributions over the years, the HUGGY LOWDOWN character featured on WPGC -- and now on rival station WMMJ -- fundamentally is the same character that Chris Paul originally created.  (McMillian Decl. ¶ 5.)

### WPGC and Jones Make a Deal

On or around September 10, 2003, without telling CBS Radio, Jones filed a Trademark Application in the U.S. Patent and Trademark Office, seeking protection for certain rights to use the HUGGY LOWDOWN mark.  Because CBS Radio had devoted substantial resources to originating and developing the HUGGY LOWDOWN character, including his on-air dialogue, the name itself and the goodwill associated therewith, CBS Radio opposed Jones's effort to register the HUGGY LOWDOWN mark.  (Rogers Decl. ¶ 5; Rouse Decl. ¶ 7; *see also* Declaration of Marissa M. Grimes, Jul. 20, 2007, Ex. 4.)

- 4 -

Jones and CBS Radio resolved this dispute in the context of with two related agreements that formalized the terms under which Jones would appear on The Donnie Simpson Morning Show.  (*See* Grimes Decl. Exs. 1, 2.)  Under a trademark License Agreement, Jones granted CBS Radio the exclusive right to use the HUGGY LOWDOWN mark in the Washington, D.C. radio market, although it left Jones free to use HUGGY LOWDOWN in other contexts, such as stand-up comedy.  (Rogers Decl. ¶ 8.)  Under a related personal services agreement with CBS Radio ("Services Agreement"), Jones was to call in to The Donnie Simpson Morning Show on WPGC for approximately five minute segments at least five times per week.  (Rogers Decl. ¶ 7.)

The parties agreed that the Services Agreement would commence on May 26, 2005 and continue in effect for one year.  They further agreed that CBS Radio had a unilateral right to renew the Services Agreement for an additional year, provided that CBS Radio inform Jones in writing at least 30 days prior to the one-year expiration date of the Services Agreement, on April 27, 2006.  (Rogers Decl. ¶ 7.)  On May 26, 2005, Jones and CBS Radio executed both agreements.  (Rogers Decl. ¶ 6.)

On June 28, 2005, after both the Services Agreement and the License Agreement were executed and in effect, the Trademark Trial and Appeals Board issued a default judgment against Jones and sustained CBS Radio's opposition because Jones had never responded to it.  (Grimes Decl. Ex. 7.)

**Jones and CBS Radio Performed Under The Services Agreement For Two Years**

Until recently, both parties fully performed their contractual obligations according to the terms of the two Agreements.  (Rogers Decl. ¶ 9.)  Towards the end of the first year

of the formal arrangements, on April 27, 2006, CBS Radio exercised the option to extend the Services Agreement by one additional year.  (Rogers Decl. ¶ 11.)  The notice of extension was sent by Jay Stevens, then the WPGC's Vice President of Programming. (Grimes Decl. Ex. 5.)

Following that extension, Jones performed for another full year.  Jones also received an increase in compensation.  Although Jones now contends that the notice of extension was untimely, before the filing of this lawsuit Jones acted in every way as if the extension was fully effective.  (McMillian Decl. ¶ 7; Rogers Decl. ¶ 12.)

When CBS Radio attempted, in early-to-mid 2007, to negotiate a continued services agreement, Jones never said that his original agreement with CBS Radio had already lapsed and never claimed that the renewal notice delivered by Stevens in April 2006 had been late or ineffective.  Rather, the negotiations proceeded on the understanding that the Services Agreement had been validly renewed and was still in place.  (Rogers Decl. ¶ 13; Rouse Decl. ¶ 9.)  In the course of negotiations, Jones informed CBS Radio that he had a competing offer from Radio One.  (Rouse Decl. ¶ 10.) Rouse pointed out to Jones that Jones could not perform the HUGGY LOWDOWN character on a rival station in the Washington, D.C. market (Rouse Decl. ¶ 10; Amended Complaint ¶ 22 ),and Jones did not dispute that point.  (Rouse Decl. ¶ 10.)

On or around December 22, 2006, Jay Stevens notified CBS Radio that he was leaving CBS Radio to join its rival Radio One.  Since December 2006, Jay Stevens has been employed by Radio One as Senior Vice President for Programming Content.  On or about June 10, 2007, Jones gave notice that he was leaving CBS Radio to join the

competition at Radio One.  Approximately one month later, on or around July 13, 2007, Radio One began advertising, on radio station WMMJ-FM and on the associated majic1023.com website, that HUGGY LOWDOWN would join the nationally-syndicated Tom Joyner Morning Show as of Monday, July 16, 2007.  (Rogers Decl. ¶ 15; Grimes Decl. Exs. 7, 8.)  Also on or about July 13, Jones served CBS Radio with the original complaint in this matter, thus confirming his plan to appear as HUGGY LOWDOWN on WMMJ in the Washington, D.C. radio market.  On the next business day, July 16, 2007, Jones appeared on The Tom Joyner Morning Show on WMMJ-FM and its website performing the same HUGGY LOWDOWN character that was previously portrayed on WPGC's The Donnie Simpson Morning Show.    (Rogers Decl. ¶ 16; Grimes Decl. Ex. 9.)

Given that The Tom Joyner show is heard on WMMJ, a radio station broadcasting in the Washington, D.C. Total Survey Area, Jones's use of the HUGGY LOWDOWN mark on WMMJ violates CBS Radio's valid and exclusive rights to use the HUGGY LOWDOWN mark on D.C. area radio through May 26, 2008.

## ARGUMENT

### I.    CBS RADIO MEETS THE STANDARD FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Immediate injunctive relief is appropriate here because, as set forth below, CBS Radio has (1) suffered irreparable harm, and (2) shown both (a) a likelihood of success on the merits, and (b) the existence of serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor.  *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 113-114 (2d

- 7 -

Cir. 2006); *GMA Accessories, Inc. v. Croscill, Inc.*, No. 06 Civ. 6236 GEL, 2007 WL 766294, at *1 (S.D.N.Y. Mar. 13, 2007); *Towers Fin. Corp. v. Dun & Bradstreet, Inc.*, 803 F. Supp. 820, 822 (S.D.N.Y. 1992) (standards for TRO are same as those governing preliminary injunctive relief).

## II.    CBS RADIO IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### A.    Jones Has Breached The License Agreement

#### 1.    The License Agreement Is Valid and Currently In Force

Jones has breached the License Agreement because CBS Radio's exclusive radio rights to HUGGY LOWDOWN in the D.C. market run through at least May 26, 2008. Paragraph 3 of the License Agreement makes clear that exclusivity does not terminate until "one (1) year following the date of termination of licensor's personal services contract with WPGC-FM." (Grimes Decl. Ex. 3.)  The Services Agreement, began on May 26, 2005, continued "for one year (1)" and was properly extended for an additional year by notice dated April 27, 2006.  Because the extension of the Services Agreement took it through and including May 26, 2007, the additional year of trademark exclusivity continues through May 26, 2008.  (Grimes Decl. Ex. 4.)

#### a.    The April 27, 2006 Extension Notice Was Timely

Although Jones now argues that CBS Radio's April 27, 2006 notification was too late, that is an obvious, after the fact effort to avoid a clear contractual obligation.  Under New York law, a year is 365 days and those days are counted by the "number of calendar days exclusive of the calendar day from which the reckoning is made."  N.Y. Gen.

- 8 -

Constr. L. §§ 20, 58. Because the Services Agreement was signed on May 26, 2005, that date is excluded from the calculation of the initial term and it remained fully in force for the following 365 days, from May 27, 2005 up to and including May 26, 2006.

Because the Services Agreement was still valid and in force on May 26, 2006, the "expiration date" was May 27, 2006, the first date on which the contractual obligations between the parties ceased to exist. The renewal notice, dated April 27, 2006, therefore was timely. "In the absence of any ambiguity, [New York courts] look solely to the language used by the parties to discern the contract's meaning." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y. 2004). "Expiration date" means the "date on which an offer, option, or the like ceases to exist," not the last day on which it does exist. Black's Law Dictionary (8th ed. 2004). Notably, the parties here did not use language such as "the anniversary date of this Agreement," which would have clearly indicated their intent to use May 26, 2006 as the reference date for determining the timeliness of any extension notification.

**b.    The Extension Was Effective Because All Parties Continued to Perform Without Objection**

Regardless of the date on which the option was exercised, the parties undisputedly continued to perform as though the contract had been extended. Under New York law, where the parties conduct their business following the expiration of an agreement in essentially the same manner as prior to the expiration, that business conduct demonstrates an implied-in-fact agreement. See, e.g., *Capital Med. Sys. Inc. v. Fuji Med. Sys., U.S.A.*

*Inc.*, 658 N.Y.S.2d 475, 477 (N.Y. App. Div. 1997); *Watts v. Columbia Artists Mgmt.*

*Inc.*, 591 N.Y.S.2d 234, 236 (N.Y. App. Div. 1992).

Both Jones and CBS Radio clearly and manifestly intended to remain bound by the Services Agreement for a second year through May 26, 2007. CBS Radio sent the written notice of extension, increased Jones's pay, and Jones continued to perform under the terms of the Services Agreement for an additional year, never once raising a question about the timeliness of the renewal or attempting to free himself from his contractual obligations. Furthermore, when the second year of the Services Agreement was nearing expiration, in the spring of 2007, Jones and CBS Radio attempted to negotiate a new agreement, with the clear understanding that the Services Agreement was still effective but nearing expiration. Under these circumstances, where both parties to the Services Agreement manifested the intention to be bound by that agreement through their conduct for another year, belated claims of a technical untimeliness of a prior renewal cannot invalidate the agreement.

Moreover, Jones has waived any right to assert that the notice of extension was late by continuing to perform under the extended Services Agreement and, because he permitted CBS Radio to rely on his continued performance, Jones is equitably estopped from denying the validity of the agreement. *See, e.g.*, *Scalia v. Glielmi*, 606 N.Y.S.2d 722, 723 (N.Y. App. Div. 1994) (finding defendant waived right to terminate an agreement to purchase a delicatessen where defendant made no effort to execute a new five year lease, a condition precedent for defendant's benefit, and continued performing under the terms of the agreement); *Loper v. O'Rourke*, 382 N.Y.S.2d 663, 665 (N.Y. Sup.

Ct. 1976) (45-day time period for occurrence of a condition was waived where party who would benefit from 45-day period had demonstrated an intention to continue performance without it).  Now that Jones has continued to perform under the extended Services Agreement for an entire year, and continued to receive payment under that Services Agreement, he cannot now assert that he is not bound by all of the obligations of both the Services Agreement and the License Agreement.  By continuing to perform under the Services Agreement, Jones led CBS Radio to believe the extension had been valid, that the Services Agreement would be in force until May 26, 2007, and the License Agreement would continue to be in force until May 26, 2008.  Jones cannot now assert otherwise.

### 2. Jones's Appearance on WMMJ-FM as HUGGY LOWDOWN Constitutes a Material Breach of the License Agreement

Because the Services Agreement remained in effect until May 26, 2007, the License Agreement exclusivity provision extends until at least May 26, 2008.  Jones' appearance on The Tom Joyner Morning Show is a material breach of CBS Radio's exclusive, royalty-free license because it is "so substantial and fundamental as to . . . defeat the object of the parties in making the contract." *Pramco III, LLC v. Partners Trust Bank*, No. 2006/02318, 2007 WL 1118380, at *6 (N.Y. Sup. Ct. Feb. 23, 2007) (quoting *Callanan v. Keeseville, Ausable Chasm & Lake Champlain R.R. Co.*, 92 N.E. 747, 752 (N.Y. 1910)).  It is black-letter law that competing uses of intellectual property by a licensor after that licensor has granted an exclusive license to a licensee constitute a material breach of contract.  *See, e.g.*, *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 285

(2d Cir. 1999); *see also Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1 (S.D.N.Y. 2001) (declining to dismiss breach of contract claim against trademark licensor for creating television show based on same characters licensed to plaintiff to produce a motion picture).

      **B.**    **Radio One Has Tortiously Interfered With Jones's Agreement With CBS Radio**

CBS Radio also has established a likelihood of success on the merits of its claim against Radio One under New York law for tortious interference with contractual relations. CBS Radio must show (1) the existence of a contract between itself and a third party; (2) defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to the plaintiff. *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993). Additionally, to demonstrate that defendant's deliberate actions resulted in a breach of the contract, CBS Radio must show that "but for" Radio One's actions, there would not have been a breach of the contract. *Alevizopoulous & Assocs., Inc. v. Comcast Int'l Holdings, Inc.*, 100 F. Supp. 2d 178, 186 (S.D.N.Y. 2000). All of these elements are present.

      **1.**    **There is a valid, legally enforceable contract between CBS Radio and Jones.**

As discussed above, the License Agreement between CBS Radio and Jones is fully valid and enforceable for purposes of the breach of contract claim against Jones. Similarly, the License Agreement provides a sufficient basis for a claim of tortious

interference. *See Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004)

(inducement to violate any legally binding agreement is actionable in tort). Even if the

second year of the Services Agreement is deemed to be implied-in-fact because of a tardy

renewal notice, that is sufficient to establish a contractual relationship between CBS

Radio and Jones for the purposes of a tortious interference claim. *See Finley v.

Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996).

### 2.    Radio One knew of the agreement between CBS Radio and Jones.

To satisfy the knowledge element of the tortious interference claim, CBS Radio

must show only that Radio One knew of the specific agreement between CBS Radio and

Jones; the defendant need not know the specific details or legal parameters of the

agreement. *Sovereign Bus. Forms, Inc. v. Stenrite Indus., Inc.*, No. 00-CIV-3867 BDP,

2000 WL 1772599, at *10 (S.D.N.Y. Nov. 28, 2000).

Here, it is virtually impossible for Radio One not to have known about the

existence of an agreement between CBS Radio and Jones and, most likely, its specific

details. Jay Stevens, currently Senior Vice President for Programming Content at Radio

One, recently served as Vice President of Programming for WPGC during part of the

time that Jones appeared on The Donnie Simpson Morning Show. Stevens was involved

in meetings and negotiations over Jones' Services Agreement and License Agreement.

Stevens was also responsible for securing the extension of the Services Agreement for the

second year and signed the letter notifying Jones of CBS Radio's intention to extend the

Services Agreement. Having been involved in these negotiations, Stevens was certainly

aware of the facts as between CBS Radio and Jones, which is sufficient even if Stevens was unaware of their legal significance.  *See Guard-Life Corp. v. S. Parker Mfg. Corp.*, 406 N.E.2d 445, 450 (N.Y. 1980).

> 3.     **Radio One's inducement of the breach of the agreement between CBS Radio Radio and Jones was intentional.**

Jones admits that Radio One offered Jones a signing bonus "that was more than the highest annual compensation offered to Jones [by CBS Radio] for Jones' continued service."  (Feigelson Decl. Ex. 2, Am. Compl. ¶ 37.)  A plaintiff can recover where a defendant's intentional interference results in a breach of the plaintiff's contract with another party, even if the defendant is engaged in lawful behavior.  *See Guard-Life*, 406 N.E.2d at 450-51.  No element of bad faith or fraud is necessary; "persuasion to breach alone, as by an offer of better terms …, has been sufficient to impose liability on one who thereby interferes with performance*."  Id.* (citation omitted).

> 4.     **Radio One's inducement of the breach of the licensing agreement inflicted injury on CBS Radio.**

Radio One's actions are the clear "but for" cause of Jones's breach.  In addition to providing the medium for Jones to appear on the air in violation of the License Agreement, Radio One offered him a large signing bonus and annual salary that encouraged him to breach the License Agreement.  (Feigelson Decl. Ex. 2, Am. Compl. ¶ ___ ).  As Jones already has appeared in character as HUGGY LOWDOWN on air on WMMJ in violation of the terms of the License Agreement, CBS Radio already has sustained injury.  Radio One's use of the HUGGY LOWDOWN mark has interfered with

CBS Radio's ability to benefit from the goodwill it has established over the previous seven years and prevents it from exploiting alternative and further uses of the HUGGY LOWDOWN mark in Jones' absence.

### III.    CBS RADIO WILL SUFFER IRREPARABLE HARM FROM THE LOSS OF ITS EXCLUSIVITY

Injunctive relief is appropriate in cases involving a unique asset, like exclusivity to a trademark, because damage to that asset is difficult, if not impossible, to quantify. That is the case here, where CBS Radio will suffer reputational loss, lose good will and unknown business opportunities as a result of the competing radio use of the HUGGY LOWDOWN mark in the D.C. market.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

CBS Radio has featured the HUGGY LOWDOWN mark and personality for the past seven years, built a following for the character and still retains the exclusive right to the mark under the terms of the License Agreement with Jones.  Use of the mark by Jones and Radio One in the Washington, D.C. market will be a complete derogation of CBS Radio's exclusive contractual rights to use the mark "on and in connection" with its radio programs in the Washington, D.C. area.  The Second Circuit repeatedly has recognized irreparable harm flows from the loss of a relatively unique business product that will result in a loss of goodwill and incalculable damages.  *See, e.g.*, *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (finding that the loss of the exclusive right to use Power Rangers characters and marks for a line of children's books can constitute irreparable harm because, without injunctive relief, the plaintiff would lose

a unique product or opportunity and the damages are would be difficult to quantify);
*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908-09 (2d Cir.1990) (overturning
a finding of no irreparable injury where a supplier of foreign news pictures threatened to
stop providing those pictures to a wire service); *Interphoto Corp. v. Minolta Corp.*, 417
F.2d 621, 622 (2d Cir. 1969) (affirming finding of irreparable harm because plaintiff
"would be unable to calculate its damages since it would suffer not merely loss of profits
with respect to . . . goods but loss of good will from the lack of a 'full line'").

Whether CBS Radio continues to use the mark in "best of" radio programs,
abstains from using the mark,or makes some other business arrangement, the exclusive
right to the HUGGY LOWDOWN mark in connection with D.C. area radio programming
remains a unique asset.  The uniqueness of that asset is destroyed when another radio
station, in the same market, uses it to compete for the same audience because it severs the
mark's exclusive affiliation with, and goodwill for, WPGC.  That is particularly true
because the HUGGY LOWDOWN mark and character originally were the creative
product of CBS Radio personnel and, since their inception almost seven years ago, have
been exclusively associated with WPGC in the context of the Washington, D.C. radio
market.

Any attempt to quantify the amount of CBS Radio's loss would at this point
purely speculative.  When it is not possible to accurately ascertain potential damages in
contract disputes, injunctive relief is the appropriate remedy. *See, e.g., Paddock Const.,*

*Ltd. v. Automated Swimpools, Inc.*, 515 N.Y.S.2d 662, 664 (N.Y. App. Div. 1987) (proper to grant preliminary injunction where monetary damages would be speculative).

Moreover, CBS Radio paid Jones valuable consideration—essentially permitting Jones to perform under the HUGGY LOWDOWN mark in any venue and geographic area other than the Washington, D.C. area radio—in exchange for Jones's promise not to use the mark on a radio station in competition with WPGC for at least one year after he left the WPGC.  In analogous situations, New York courts have enforced similar limited covenants not to compete when the covenant protects services that are special or unique. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999).  Where an individual provides a unique service, it is "very difficult to calculate monetary damages that would successfully redress the loss" of that unique service.  *Id.* at 69.  If, as here, the "unique services" of the party become available to a competitor, "the employer obviously suffers irreparable harm."  *Id.* at 70.  An injunction is necessary to prevent Jones from damaging the goodwill developed in HUGGY LOWDOWN WPGC and unfairly competing to WPGC's detriment.

At the same time, the License Agreement only circumscribes Mr. Jones's use of the mark to the extent it would directly conflict with CBS Radio's exclusive radio rights in the Washington, D.C area market.  All other uses of the mark by Jones are permissible.  Mr. Jones is still free to use the mark to engage in stand-up comedy in front of live audiences under the name HUGGY LOWDOWN and even to use the mark on a radio broadcast, provided he does so outside of the Washington, D.C. area.  *Cf. H. B. Fuller*

*Co. v. Hagen*, 363 F. Supp. 1325 (W.D.N.Y. 1973) (court issued an injunction when salesman violated two-year covenant not to compete, when the covenant was reasonable under applicable New York law, notwithstanding contentions that amount of business taken by the salesman from his former employer was small in comparison with former employer's total business and that an injunction would impose severe hardship upon salesman and his wife who had eight children).  In short, the very reasonable scope of the limitation contained in the License Agreement, as well as the one-year duration, are carefully tailored to protect CBS Radio's legitimate interests.

## IV.    CBS RADIO ALSO SATISFIES THE ALTERNATE STANDARD FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

CBS Radio is also entitled to provisional relief under the alternate standard because it can show that (1) serious questions exist going to the merits of its case, and that these questions are fair ground for litigation, and (2) the balance of hardships tips in its favor.  *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir. 1985).

Because it has shown a convincing likelihood of success on the merits, CBS Radio, by definition, also has raised very substantial objections and questions that are fair game for litigation.

The remaining issue, the balance of hardships, tilts decidedly in CBS Radio's favor.  If no injunction is issued, CBS Radio will suffer significant, irreparable hardship. The time and money that CBS Radio has already invested in developing and promoting the HUGGY LOWDOWN character and mark, and the good will that CBS Radio has created, will be eroded and CBS Radio's exclusive contractual right to use the HUGGY

LOWDOWN mark in connection with radio programming in the Washington, D.C. Total

Survey Area will be destroyed.  No later action by the Court could retrieve consumers'

goodwill toward WPGC's HUGGY LOWDOWN character once it has been lost.

By contrast, Jones and Radio One would suffer a minimal inconvenience if the

preliminary relief is granted.  Radio One will suffer no harm because Jones is a new

addition to the well-established Tom Joyner Morning Show.  Delaying his appearance on

the show for one year or carving out the Washington, D.C. Total Survey Area from the

places where the HUGGY LOWDOWN character is used would not at all affect the

success of The Tom Joyner Morning Show.  Similarly, Jones will not be harmed by being

precluded from being broadcast on D.C. radio as HUGGY LOWDOWN, given that he

can be broadcast outside of the Washington, D.C. Total Survey Area and can continue to

perform live in nightclubs and other venues as HUGGY LOWDOWN at events, so long

as they are not affiliated with any broadcast radio station from the Washington, D.C. area

radio market.

## <u>CONCLUSION</u>

For the foregoing reasons, CBS Radio requests that the Court grant temporary and permanent relief and enjoin Jones and Radio One from using the HUGGY LOWDOWN mark in any way in connection with any radio broadcast or promotion in the Washington, D.C. Total Survey Area through May 26, 2008.

Dated:  New York, New York          Respectfully submitted,
        July 20, 2007

                                    DEBEVOISE & PLIMPTON LLP

                                    By:  __/s/ Bruce P. Keller__

                                    Bruce P. Keller
                                    Jeremy Feigelson
                                    919 Third Avenue
                                    New York, New York 10022
                                    (212) 909-6000

                                    *Attorneys for Defendant and Third-*
                                    *Party/Counterclaim-Plaintiff Infinity*
                                    *Broadcasting Corporation n/k/a CBS Radio*
                                    *Radio Inc. of Washington, D.C.*

- 20 -