UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

SAMUEL L. JONES JR.,

                Plaintiff,

      -against-

INFINITY BROADCASTING CORPORATION
OF WASHINGTON, D.C. n/k/a CBS RADIO
INC. OF WASHINGTON, D.C.,

              Defendant.

-----------------------------------------------------------

07 CIV 5693 (BSJ) (AJP)


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S APPLICATION FOR TEMPORARY
<u>RESTRAINTS</u>**


**LEBENSFELD BORKER SUSSMAN & SHARON LLP**
Two Penn Plaza, Suite 1980
New York, New York 10121
(212) 594-2030

## *TABLE OF CONTENTS*

*Page*

Table of Authorities...………………………………………………………… ii

Introduction and Summary of the Argument........................................................ 1

Summary of Relevant Documents and Facts ...................................................... 4

     The License Agreement ................................................................. 4

     The Personal Services Contract… ................................................. 5

     The Untimely April Renewal Notice ……………………………….. 6

     The "Negotiations" to Retain Jones' Services……………………… 6

Argument………………………………………………….. ........................ 8

    I.    THE LCENSE AGREEMENT TERMINATED AT THE
        LATEST ON MAY 25, 2007, ONE YEAR AFTER THE
        EXPIRATION OF THE PERSNAL SERVICES CONTRACT…… 8

    II.   IT WOULD BE INAPPROPRIATE TO RELY UPON ANY
        FACTUALLY DISPUTED COURSE OF DEALINGS TO
        REVIVE THE PERSONAL SERVICES CONTRACT …………… 11

    III.  EVEN IF THE RENEWAL OPTION WERE DEEMED
        TO HAVE BEEN TIMELY EXERCISED, ENFORCEMENT
        THE POST-TERMINATION RESTRICTION ON JONES'  USE
        OF THE HUGGY LOWDOWN CHARACTER WOULD BE
        BARRED UNDER (1) THE PUBLIC POLICY AND
        CONTROLLING LAW OF NEW YORK LAW <u>AND</u> (2)
        THE STATUTORY LAW OF THE DISTRICT OF COLUMBIA… 15

          New York Law……………………………………..…….. 16

          Washington, D.C. Law……………………………………... 18

Conclusion…………………………………………………………………… 22

Addendum A -- Chart/calendar – May 2005, April – May 2006

Addendum B – Report of no Certificate of Authority applicable to Defendant
        in New York

## TABLE OF AUTHORITIES

*Cases*                                                                    *Page*

*ABC v. Wolf,*
    52 N.Y.2d 394, 438 N.Y.S.2d 482 (1981) ..................................    16

*Matter of Allstate Ins. Co. (Stolarz),*
    81 N.Y.2d 219, 613 N.E.2d 936 (1993).......................................    20, 21

*Autohaus Brugger, Inc. v. Saab Motors, Inc.,*
    *567 F.2d 901* (9th Cir. 1978)..........................................    14

*Autowest, Inc. v. Peugeot, Inc.,*
    287 F.Supp 718 (E.D.N.Y. 1966) ..................................    13

*Bessette v. Niles,*
    23 A.D. 3d 996, 803 N.Y.S.2d 837 (App. Div. 4th Dep't 2005)...................    12, 13

*Culbert v. Rols Capital Co.,*
    184 A.D.2d 612, 585 N.Y.S.2d 67 (App. Div. 2nd Dep't 1992) ...................    19

*Clark Paper & Mfg. Co. v. Stenacher,*
    236 N.Y. 312, 140 N.E. 708 (1923)................................    18

*Fanning Technical Search v. 100% Girls Brand Inc.,*
    292 A.D.2d 301, 740 N.Y.S.2d 28 (App. Div. 1st Dep't 2002) ...................    20

*Korody Marine Corp. v. Minerals & Chemicals Philipp Corp.,*
    300 F.2d 124 (2d Cir. 1962).......................................    13

*Jacobson. v. Sassower,*
    66 N.Y.2d 991, 489 N.E.2d 1283 (NY, 1985)..............................    19

*Lazard Freres & Co. v. Protective Life Ins. Co.,*
    108 F.3d 1531 (2d Cir.1997)........................................    19, 20

*L.M. Rabinowitz & Co. v. Dasher,*
    82 N.Y.S.2d 431 (Sup. Ct. New York Co. 1948) ..........................    11

*Local Union 813, International Brotherhood of Teamsters v. Waste Management
Of New York, LLC,*
    469 F.Supp.2d 80 (E.D.N.Y. 2007) ................................    13

*Madison Realty, Inc.  v. Neiss,*
    253 A.D.2d 882, 676 N.Y.S.2d 672 (App. Div. 2nd Dep't 1998) .................    20

*Martin  v. Campanaro,*
    156 F.2d 127 (2d Cir. 1946)...........................................................    13, 14

*Messina  v. Lufthansa German Airlines,*
    47 N.Y.2d 111, 390 N.E.2d 758 (1979)..........................................    9

*New York Tel. Co.  v. Jamestown Tel.,*
    282 N.Y.365, 26 N.E.2d 295 (NY, 1940) ......................................    16

*Nigra v. Young Broadcasting of Albany, Inc.,*
    177 Misc. 2d 664, 676 N.Y.S.2d 848 (Sup. Ct. Albany Co. 1998) ...............    12

*Shubert Theatrical Co. v. Rath,*
    271 F. 827 (2d Cir. 1921)................................................................    10

*Urban Archaeology Ltd.  v. Dencorp,*
    12 A.D.3d 96, 783 N.Y.S.2d 330 (App. Div. 1st Dep't 2004) ......................    10

## **Statutes**

D.C. Code Ann. § 32-532 (2007) ..............................................................    4, 18

NY Gen. Constr. L. § 20 (2007) .............................................................    8, 9

NY Gen. Constr. L. § 58 (2007) .............................................................    8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

**SAMUEL L. JONES JR.,**

       **Plaintiff,**

    -against-

**INFINITY BROADCASTING CORPORATION OF WASHINGTON, D.C. n/k/a CBS RADIO INC. OF WASHINGTON, D.C.,**

       **Defendant.**

------------------------------------------------------------

    07 CIV 5693 (BSJ) (AJP)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S APPLICATION FOR TEMPORARY RESTRAINTS

### Introduction and Summary of the Argument

Defendant, Infinity Broadcasting Corporation of Washington, D.C. n/k/a CBS Radio Inc. of Washington, D.C. ("Infinity" or "CBS"), is one of the many affiliated entities owned, directly or indirectly, by CBS Corporation. See http://www.cbsradio.com/about/index.html. CBS operates an FM radio station, WPGC, which broadcasts into Washington, D.C. and its surrounding areas. Plaintiff Samuel L. Jones Jr. ("Jones") is an entertainer, primarily a comedian. Since about September 1999, Jones has used, in appearances at various venues such as comedy clubs, a character known as Huggy Lowdown ("Huggy"). Huggy is a "street" character who offers gossip and information about celebrities, current events and politics with a comedic twist. Jones Decl., ¶ 1.[1]

Commencing in the year 2000, until June 8, 2007, Jones was a regular feature on the Donnie Simpson Morning Show on WPGC. On a daily basis, Monday through Friday, Jones, as

---

[1] Reference to the "Jones Decl." is to the Declaration of Samuel L. Jones Jr. in Opposition to Defendant's Motion for Temporary and Preliminary Restraints, dated July 19, 2007.

Huggy, would "call-in" to the show from his home in Washington, D.C. and, for several minutes, entertain the radio audience with his comments. For his services, Jones was paid in varying amounts, from no compensation at all up to a <u>maximum</u> of about $26,000 annually at the time of his departure on June 8, 2007. <u>Id</u>., ¶ 2.

This proceeding involves CBS's claim, disputed by Jones, that Jones cannot appear on any radio program broadcast in the Washington, D.C. area as Huggy for a 1-year period ending June 8, 2008 (or May 25, 2008).[2] CBS bases its claim on a license agreement dated May 26, 2005 between the parties, which acknowledges Jones' ownership of the Huggy Lowdown mark and which licenses WPGC to use the Huggy character on its stations. Such license purports to terminate a year "following the date of termination of [Jones'] personal services contract with WPGC." Such personal services contract was for an initial term of 1 year from the date of execution by Jones. A handwritten date of 5-26-05 appears on the signature page. The personal services contract contains an option to renew in favor of CBS that was <u>not</u> timely exercised.

On June 11, 2007, Jones entered into a contract with Radio One, Inc. ("Radio One"), a competitor of CBS's, pursuant to which Jones appears as Huggy on the <u>Tom Joyner Morning Show</u>, a syndicated radio program broadcast on weekdays in and from the Washington, D.C. radio market. The initial appearance by Jones occurred July 16, 2007. If CBS is successful in its application for injunctive relief, Jones will be in breach of a material provision of his agreement with Radio One, and his compensation thereunder in jeopardy. Such compensation, as explained below, is many times the amount paid to Jones by CBS and, indeed, many times the amount offered by CBS to retain Jones' services. Thus, CBS -- on the basis of an agreement that measures its post-termination restriction from the termination of an expired [personal service]

---

[2] This Brief is written in advance of receipt of CBS's papers, and responds to arguments that we expect to be made.

2

contract -- seeks to punish Jones for his refusal to accept a significantly below-market offer made by CBS to retain Jones' services. If CBS is successful on its current application, the only alternatives available to Jones will be to accept CBS's substantially below market offer (if indeed, it remains open) or leave the region he has called home for his entire lifetime and forego his daily contact with his 13-year old daughter with whom he has a very close and loving relationship. Such Hobson's Choice is no choice; and neither the facts, the law nor CBS's prowess in the marketplace can justify such a result. Although CBS attempts to characterize this dispute as one involving two large competitors, namely, CBS Radio and Radio One, the reality is that this case will have its most direct, and lasting, impact on a 39-year old individual with a 12th grade education, who has struggled throughout his life to earn a living, and who has a teenage daughter to support. A court sitting in equity cannot permit this result.

Moreover, notwithstanding its bluster and protestations of irreparable injury, CBS's likelihood of success on the merits is slim or non-existent, and the equities are balanced squarely in favor of Jones. CBS, the draftsman of the documents presented to, and signed by, an individual unrepresented by counsel, should be held to the terms of such documents. Casting aside smoke and mirrors, the renewal option in favor of CBS in the personal services contract had to be exercised by April 25, 2006. It was exercised on April 27, 2006. That was too late, and under New York law, discussed in Point I, CBS cannot be relieved of the consequences of its untimely exercise of the renewal option to the substantial detriment of Jones.

In Point II we address CBS's alternative, or primary, argument that the parties' course of conduct -- in which it attributes to Jones a degree of sophistication that is non-existent -- should be used to excuse the untimely exercise of the renewal option. Such arguments, we show, are totally unsupported by the facts and the law.

3

Point III -- which the Court need address <u>only</u> if it finds that CBS somehow satisfied its burden of showing a likelihood of success on the merits with regard to the viability of the 1-year post-termination restriction in the license agreement, as measured by a renewed personal services contract -- discusses the fact that enforcement of the post-termination restriction concerning Jones' use of the Huggy character on radio in the Washington, D.C. market area would be inconsistent with (1) the general public policy and case law of New York <u>and</u> (2) the statutory law of the District of Columbia. In such latter respect, we show, at a minimum, that the personal services contract -- which represents the yardstick against which to measure, and is thus intricately entwined with, the post-termination restriction in the license agreement -- is governed by the law of the District of Columbia, which, plainly and simply, makes "unenforceable" the restrictive covenant sought to be enforced by CBS. <u>See</u> D.C. Code Ann. § 32-532 (2007) (providing District of Columbia's broadcast industry non-compete law, which declares non compete clauses "unenforceable").

## Summary of Relevant Documents and Facts

### The License Agreement

The license agreement ("License Agreement"), consisting of four (4) pages, was "entered into this 26th day of May 2005" between Jones and CBS. Pursuant to the provisions of the license agreement, CBS was given the royalty-free, exclusive, right to use the "Trademark" on radio in Washington, D.C. Total Survey Area (as defined therein). The Trademark is defined in the license agreement as the application filed by Jones with the United States Trademark and Patent Office for the trademark HUGGY LOWDOWN "for entertainment services, namely comedy performances, broadcast over satellite radio and broadcast radio; [and] stand up comedy in front of live audiences." The license agreement further provides, in paragraph 10, that "[u]pon

4

termination of this Agreement for any reason whatsoever, all rights in the Trademark will immediately and automatically revert to Licensor [Jones]," the owner of the mark. The License Agreement provides (par. 12[h]) that it will be governed by the internal laws of New York. <u>The term of the license</u> "shall commence on the date set forth above and <u>shall terminate one (1) year following the date of termination of the licensor's personal service contract with WPGC.</u>"

**The Personal Services Contract**

Jones was presented by CBS with a draft of a "personal service contract" in the form of a letter agreement, on "blank letterhead," addressed to and prepared for Jones' countersignature. Although Jones has no present recollection of having signed such draft personal services contract, since the date of filing of the original complaint herein, CBS presented Jones with a copy thereof which appears to contain the countersignature of Jones and the date of "5-26-05." Jones Decl., ¶ 6.

The personal services contract provides for call-ins by Jones of "appx. 5 min. length to the Donnie Simpson Morning Show" five times a week. It was addressed to Jones at his home in Washington, D.C., where the call-ins to WPGC were made by Jones. <u>The Term</u>, as set forth in paragraph 2, "<u>shall commence on the date of signing of this [A]greement</u> and shall continue for one (1) additional year provided Station [WPGC] informs Contractor [Jones] in writing at least 30 days prior [to] the one (1) year expiration date of this Agreement." Paragraph 4 provides that Contractor ("during the Term") "will not appear by voice, picture or likeness on any other radio station within the Washington DC market."

Paragraph 10 of the personal services contract provides that "[this Agreement contains the entire understanding between the parties and shall be construed according to the laws of the State of [state]" <u>Sic</u>.

5

**The Untimely April 27 Renewal Notice**

By letter dated April 27, 2006, CBS "advised [Jones] that pursuant to your agreement with Infinity Broadcasting Corporation of Maryland, dated May 26, 2006 [sic] notice is hereby given that WPGC desires to continue to utilize your services after the expiration of your present agreement. This serves as notice we are exercising the option extending the terms of your agreement for another year."[3] Jones, who was under the impression that such notice required his signature, which he declined to give, made no response to such "renewal notice." Jone Decl., ¶¶ 7-10.

**The "Negotiations" to Retain Jones' Services**

During the 5-month period preceding June 2007, Jones had discussions with CBS officials about his remaining at WPGC. Jones Decl., ¶ 12. The money that Jones was paid by WPGC, although modest, represented a significant portion of Jones entire income. It was used to support Jones and to assist in the support of his teenage daughter. During his discussions with CBS officials, Jones was told he was a valuable member of the WPGC team. Nevertheless, the highest dollar amount offered to Jones for his continued services was about $45,000 annually. Jones Decl., ¶¶ 2, 3.

The amount offered by WPGC to retain Jones' services -- although a substantial raise -- appeared low for a "valued member of the WPGC team." As a result, Jones made an effort to find out what the market was for his services. In a relatively short time, Jones learned that his services were worth much more than WPGC had been offering. When Jones told WPGC officials that its offer to him was not sufficient, he was told that $45,000 was "the offer." Id., ¶ 4.

---

[3] A copy of the April 27 Renewal Notice is attached to the Jones Decl.

6

During the same time that Jones was attempting to negotiate a more reasonable deal with WPGC, Jones' attorney, Robert Keene, was having discussions with both CBS and representatives of Radio One. In his discussions with CBS representatives, reference was made to the 1-year restriction on Jones' radio appearances as Huggy in the D.C. market. Keene Decl., ¶ 2.[4] The message was clear: work for WPGC at whatever CBS unilaterally elects to pay or you won't appear on the radio in the only place you have ever lived. Jones' co-workers and bosses at CBS were aware of his ties to D.C., and the fact that he would never leave the area. Jones Decl., ¶ 5.

The contract that Jones signed with Radio One on June 11, 2007 requires him to appear as Huggy on the <u>Tom Joyner Morning Show</u>, a syndicated radio program broadcast Monday through Friday between 6:00 a.m. and 10:00 a.m. in competition to the <u>Donnie Simpson Morning Show</u>. Such appearances by Jones as Huggy on the <u>Joyner</u> show began on Monday, July 19. If CBS is successful in its current application, Jones will be unable to perform his most important obligation under his contract with Radio One. Although the <u>Joyner</u> show is syndicated, it is broadcast live from the D.C. area, which is the only area in which Huggy is now widely known. <u>Id.</u>, ¶ 7.

Under Jones' contract with Radio One, Jones was paid a <u>signing</u> bonus -- although modest -- that was more than the highest <u>annual</u> compensation offered by WPGC to him for his continued service. Jones also receives health insurance from Radio One for himself and his daughter, which is a "luxury" that Jones was never able to afford, <u>and</u> which CBS had <u>declined</u> to provide to Jones. In addition, with such signing bonus from Radio One, Jones was able to pay off the debts he had accumulated because of the high cost of living in D.C. and his obligations of

---

[4] Reference to the Keene Decl. is to the Declaration of Robert W. Keene, Jr., Esq., dated July 16, 2007.

7

support.  Jones' actual annual compensation from Radio One is <u>many</u> times the highest offer made to Jones by WPGC to persuade him to stay.  <u>Id.</u>, ¶ 14.

CBS's efforts, if successful, would deprive Jones of a well-deserved and entirely legitimate opportunity to advance his life and career to the point of economic respectability.  Although CBS's goal may comport with the marginal value it has placed on Jones, its success on this motion would run counter to both law and basic notions of fairness and equity.

**ARGUMENT**

**I.**

**THE LICENSE AGREEMENT TERMINATED
AT THE LATEST ON MAY 25, 2007,
ONE YEAR AFTER THE EXPIRATION OF
THE PERSONAL SERVICES CONTRACT**

The term of the License Agreement, as noted, on its face, terminates a year "following the date of termination of [Jones'] personal services contract with WPGC."  Inasmuch as the purported renewal of the latter contract was untimely, it expired on May 25, 200<u>6</u>, in consequence of which the license agreement expired one year later, namely, on or prior to May 25, 200<u>7</u>.  CBS's efforts to enforce an expired license to the substantial prejudice of Jones is utterly devoid of merit.

The 1-year term of the personal services contract commenced "on the date of [its] signing," namely, on May 26, 2005.  In New York, a "year" is defined as 365 days in a normal (non-leap) year.  NY Gen. Constr. L. § 58 (2007).  Neither 2005 nor 2006 was a leap year.  Thus, 365 days <u>after</u> the commencement of the personal services contract is May 25, 2006.

The renewal option in the personal services contract was required to be exercised "at least 30 days prior [to] the one (1) year expiration date of this Agreement."  New York's General

8

Construction Law § 20 (2007) states that: "[a] number of days specified as a period from a certain day within which or after or before which an act is authorized or required to be done means such number of calendar days exclusive of the calendar day from which the reckoning is made." NY Gen. Constr. § 20 (2007).

Not to belabor the obvious, but because CBS continues to assert that its April 27 Renewal Notice was timely, we refer the Court to <u>Messina v. Lufthansa German Airlines</u>, 47 N.Y.2d 111, 390 N.E.2d 758 (1979) ("<u>Messina</u>") The New York Court of Appeals used <u>Messina</u> as a vehicle to address "a seemingly uninvolved but apparently recurring question as to how to measure a time period specified in a contract in terms of a number of days before or after a particular date." <u>Messina</u>, 47 N.Y.2d at 113, 390 N.E.2d at 759.

In <u>Messina</u>, an employer had an option to extend a probationary period, expiring on November 20, "ten (10) days before the expiration" of such period. <u>Id</u>. The notice, given on November 11 "was one day short" (<u>id</u>.) of the required notice, and thus invalid. As the unanimous Court explained:

> We therefore conclude that, under <u>section 20</u> [General Construction Law], since the first 60 days of Messina's employment expired, at the latest, at midnight on November 20 (see General Construction Law, s 19; Matter of O'Grady v. Low, 74 App. Div. 246, 77 N.Y.S. 661), that day must be excluded in calculating the 10-day notice period. So calculated, November 19 was the first day before expiration, and November 10 the 10th day. Accordingly, notice on November 11 was one day late.

> It seems to us that this conclusion finds support in elementary logic and arithmetic. If the contract had required notice one day before expiration, it could hardly be suggested that notice on the very day of expiration itself would be timely. So, if November 19 is the first day before expiration, a fortiori, November 10 is the 10th. Alternatively, the 10-day period may be viewed as establishing a precise deadline. If midnight on November 20 is the moment of expiration, notice would have to precede it by at least 10 24-hour periods, making midnight on November 10, once again, the latest that notice could have been given.

9

47 N.Y.2d at 115, 390 N.E.2d at 760.

Thus, the April 27 Notice -- given only <u>28</u> days before the expiration of the 1-year term of the personal services contract, was untimely.[5]

In <u>Shubert Theatrical Co. v. Rath</u>, 271 F. 827 (2d Cir. 1921) ("<u>Rath</u>"), the Court of Appeals for the Second Circuit affirmed the District Court's award of an injunction to prevent acrobatic performers from rendering services for a rival firm during the renewal term of a personal services contract. In that case, the renewal option had to be exercised by July 1. The Court found that a letter exercising such option, having been mailed on June 7, but apparently not received by the performers, nonetheless, was sufficient to constitute "an acceptance" by plaintiff of the option. 271 F. at 833. As such, the Court had no difficulty in finding the injunction to have properly issued by the District Court. Most particularly instructive -- and, indeed, dispositive of CBS's motion -- is the Court of Appeals' observation that "[i]<u>f the option was not exercised according to its terms, the contract</u> has <u>expired, the defendants have not violated it, and no injunction can issue.</u>" 271 F. at 833; emphasis added.

Time, of course, is plainly material to exercise of an option. An option consists of two parts: first, the offer to sell or render services, which is not a contract until accepted; and second, a contract to leave the offer open for the time specified. <u>Rath</u>, 271 F. at 833. It is an ongoing offer, which may not be withdrawn until the expiration of the specified date. <u>Id</u>. In fact, it is a widely accepted principle that time is of the essence when it comes to options. See <u>Urban Archaeology Ltd. v. Dencorp Investments, Inc.</u>, 2 A.D.3d 96, 103, 783 N.Y.S.2d 330, 335 (App. Div. 1st Dept. 2004) ("[W]hether the question arises either at law or in equity, it is well settled that time is of the essence of an option.")

---

[5] A chart/calendar, applying the principles of <u>Messina</u> and the N.Y. General Construction Law, is Addendum A to this Brief.

10

Given that the foregoing establishes that (1) the purported exercise of the option to renew was untimely and (2) that time is of the essence in regard to such exercise, we turn, in Part II immediately below, to CBS's effort to trump these settled principles by its assertion that Jones's course of conduct purportedly ratified CBS's untimely renewal. To attribute such conduct to Jones is inconsistent with both the facts and the law.

## II.

### IT WOULD BE INAPPROPRIATE TO RELY ON ANY FACTUALLY DISPUTED COURSE OF DEALINGS TO REVIVE THE PERSONAL SERVICES CONTRACT

As a threshold matter, we are unaware of any case in which the continuance of employment after an expired contract enabled the employer to enforce a post-departure restrictive covenant in such expired contract. To the contrary, courts in New York have expressly declined to do what CBS requests of this Court.

Long ago, the Supreme Court, New York County, rejected an employer's claim that a post-employment restrictive covenant in an express, but expired, employment contract should be enforced on the basis of the employee's continued employment after the expiration of the term. L.M. Rabinowitz & Co. v. Dasher, 82 N.Y.2d 431, 441 (Sup. Ct. N.Y.Co. 1948). As the Court noted:

> The contract was prepared by the plaintiff's lawyers. The defendant Dasher had no legal advice. The contract is to be most strictly construed against the party who prepared it, and this is especially so 'where the words are chosen by the master under legal advice, and accepted by the servant without the aid of like instruction.' Moran v. Standard Oil Co., 211 N.Y. 187, 196, 105 N.E. 217, 221.

*   *   *

> In the language of the Court of Appeals in Strauss v. Ernstein, 232 N.Y. 187, 195, 133 N.E. 440, 442: 'It may perhaps be said that the interpretation which we

11

have placed upon the contract of the parties is not beyond doubt.  It seems to us to be the more reasonable one, and if there be ambiguities in the contract they are to be resolved against the defendants who undertook to embody in writing the agreement which the parties had made.'

Nor are we impressed by the plaintiff's claim that this contract, regardless of its meaning, was renewed each year by implication.  The acts of the parties rebut any such implied intent.  Dasher's salary was reduced at one time.  On other occasions his salary was increased."

82 N.Y.S.2d at 441.

Here, the personal services contract called for compensation of $23,000.  It is undisputed that such compensation was increased to $26,000.  Jones Decl. ¶ 11.  Moreover, for at least five months before Jones' departure on June 8, 2007, he was engaged with discussions with CBS officials about a new deal.  Id., ¶¶ 3, 12.

For CBS to rely upon Jones' continued working at WPGC after May 2006 to constitute conduct that would trigger all of the terms of the expired contract is, simply, unwarranted.  After all, Jones had worked at WPGC for five years without anything in writing, and there is, at an absolute minimum, a well-founded reason to credit Jones' position that he could continue at WPGC without a written contract.

CBS's equal reliance on Jones' lack of any response to its untimely renewal notice is similarly misguided.  Jones, with a 12th-grade education and absolutely no experience in business affairs, did not comprehend the significance, if any, of the untimely notice.  Indeed, it was his view that, without his countersignature, it meant nothing at all.  Jones Decl., ¶¶ 9-10.  Any doubt regarding Jones' sophistication can readily be resolved at any evidentiary hearing.

More recently, the Appellate Division, in Bessette v. Niles, 23 A.D.3d 996, 803 N.Y.S.2d 837 (4th Dep't 2005), refused to apply the provisions of an expired office sharing agreement by reason of the parties' continued dealings.  As stated by the Appellate Division:

That agreement terminated by its own terms after one year, and thus the rights and obligations of the parties to the agreement also terminated at that time (see Twitchell v. Town of Pittsford, 106 A.D.2d 903, 904, 483 N.Y.S.2d 524, affd. 66 N.Y.2d 824, 498 N.Y.S. 2d 363, 489 N.E.2d 250). Indeed, "[t]he fact that the parties continue to deal under some sort of informal arrangement does not, without more, mean that all the terms of the expired formal [agreement] continue to apply" (id).

23 A.D.2d at 997, 803 N.Y.S.2d at 839. Accord, Karody Marine Corp. v. Minerals & Chemicals Philipp Corp., 300 F.2d 124, 125 (2d Cir. 1962) (same); Autowest, Inc. v. Peugeot, Inc., 287 F.Supp. 718, 721 (E.D.N.Y. 1966). (an expired contract "may furnish, in default of a new agreement, the basis on which the transactions that constitute the informal continuance of the relation will be conducted and liquidated, but it goes no farther.") See also New York Tel. Co. v. Jamestown Tel., 282 N.Y. 365, 371, 26 N.E.2d 295, 297 (N.Y., 1940):

> ("[e]ven in such case, however, *the reciprocal obligations arise from the new implied contract* and, unless an intent to make such a new contract is expressed or may be fairly inferred from the conduct of the parties, the obligations of the parties are as matter of law not measured by terms of the contract which has expired." (emphasis added).

Thus, the parties must also intend not only to continue a contractual relationship, but for the terms of the original contract to continue. As is evident from Mr. Jones's Declaration, his intent was clearly not to renew all the terms of the existing contract. (Jones Decl. ¶ 9)("[b]ecause I didn't want to be tied up, I did not sign the letter.")

CBS's presumed reliance on Martin v. Campanaro, 156 F.2d 127 (2d Cir. 1946) ("Campanaro"), and its progeny,[6] is substantially misplaced. In Campanaro, the Court noted as follows:

---

[6] See Local Union 813, Int'l Brotherhood of Teamsters v. Waste Management of New York, LLC, 469 F.Supp.2d 80 (E.D.N.Y, 2007).

13

> [w]hen an agreement expires by its terms, if, *without more*, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old. Ordinarily, the existence of such a new contract is determined by the "objective" test, i.e., whether a reasonable man would think the parties intended to make such a new binding agreement-whether they acted as if they so intended.

Campanaro, 156 F.2d at 129; emphasis added.

Several advocates of Campanaro often quote only the first sentence, and not the second, and are usually criticized for such deception. See, e.g. Autohaus Brugger Inc. v. Saab Motors, Inc., 567 F.2d 901, 915 (9th Cir. 1978). We assume CBS will not be such an advocate.

Nevertheless, Campanaro, which is not inconsistent with the New York State cases cited above, emphasized that the italicized language "without more" is not to be disregarded. Indeed, in Campanaro, the Court found that the facts of that case failed the objective test because of attempts to have the terms of the agreement changed. Id. at 129. ("we think that a 'reasonable man' would not believe that, when these employees continued to work, while . . . making efforts to procure revised terms, they were agreeing to work . . . at the old rates.").

Here, as above noted, there is much "more." Jones' pay was increased from that set forth in the personal services contract (Jones Decl., ¶11), there were continued negotiations for a new agreement during the 5-month period before Jones departed (id. ¶¶ 3, 12), Jones' receipt of compensation after the personal services contract expired was no different than his receipt, for 5 years, of compensation without any written agreement prior to his entry into the personal service contract (id, ¶ 10) and, finally, Jones had no true appreciation of the import of the April 27 letter (id., ¶¶ 7-9).

In sum, CBS's reliance on any conduct on the part of Jones to revive the expired personal services agreement (and the post-departure restrictions measured by such expiration) is

14

unwarranted. At a minimum, the post-expiration conduct is sufficient for this Court to determine that CBS has not showed its entitlement to the extraordinary relief of a temporary injunction. Indeed, as shown below, in Point III, the conduct by CBS, in which it transforms such restrictive covenant (expired or not) into a vehicle to keep Jones "in the fold" for a small fraction of his market value, disqualifies it from the equitable relief sought herein under both New York law and the statutory law of Washington, D.C.

## III.

**EVEN IF THE RENEWAL OPTION WERE DEEMED TO HAVE BEEN TIMELY EXERCISED, ENFORCEMENT OF THE POST-TERMINATION RESTRICTION ON JONES' USE OF THE HUGGY LOWDOWN CHARACTER WOULD BE BARRED UNDER (1) THE PUBLIC POLICY AND CONTROLLING LAW OF NEW YORK AND (2) THE STATUTORY LAW OF THE DISTRICT OF COLUMBIA**

Before this Court, CBS espouses the view that Jones can work in radio outside Washington, D.C. (and on programs that do not broadcast into the Washington, D.C. market), or at comedy clubs in the area. CBS, of course, is well aware that (1) the Joyner Show is broadcast live from the D.C. market area and (2) Jones would not leave the only home he has known (and his daughter). Thus, even though the personal services contract was not timely renewed, CBS was confident it could use the 1-year restriction as the hammer to prevent Jones from marketing his Huggy character on radio in the Washington, D.C. area -- and, thus, retaining Jones' services for WPGC for compensation well below market.

Although the Court need not reach the issues raised in this point in order to deny CBS's request for injunctive relief -- which, if granted, would put Jones in jeopardy of being in material breach of his valuable contract with Radio One --, this Court, sitting as an equity court in a diversity

15

case, cannot reward CBS's conduct by granting its requested injunctive relief. And that is true both

under both New York law and the law of the District of Columbia.

**New York Law**

   Nigra v. Young Broadcasting of Albany, Inc., 177 Misc. 2d 664, 676 N.Y.S.2d 848 (Albany

Co. 1998) is directly in point. Sue Nigra ("Nigra") was a broadcaster for Station WTEN-TV

("WTEN") in Albany. She had fulfilled the terms of her 2-year contract with WTEN when she

received a "job offer from another television station to work for twice the salary that WTEN offered

to keep her." 177 Misc. 2d at 665, 676 N.Y.S.2d at 848.

   Nigra's expired 2-year contract had a restrictive covenant that would bar her from working

for, or even appearing, on any commercial television station that broadcast or transmitted to any

place within WTEN's broadcast area. The discussion by the Court in Nigra is so apropos to the

situation at bar that extensive quotation (with citation to the seminal New York case of ABC v.

Wolf, 52 N.Y.2d 394, 438 N.Y.S.2d 482 (1981), and related cases, omitted) is warranted:

> WTEN alleges that plaintiff's appearance on another channel would
> cause WTEN irreparable harm, due to her popularity, wide ranging
> experience in "everything from state government news to changes in
> local health care". . . . Furthermore, plaintiff allegedly possesses a
> following of many loyal viewers who would follow her to another
> channel.
>
>                    *    *    *
>
> Turning to the likelihood of plaintiff succeeding on the merits of her
> claim, once the term of an employment agreement has expired, the
> general public policy favoring robust and uninhibited competition
> should not give way merely because an employer wishes to insulate
> itself from competition from a former employee. It is well
> established that restrictive covenants that tend to prevent an
> employee from pursuing a similar vocation after termination of
> employment are not favored by the law. . . . Anti-competitive
> employment agreements, therefore, are enforced only to the extent
> necessary to protect the employer from unfair competition that stems

from the employee's use or disclosure of trade secrets or confidential customer lists or where the employee's services are unique. . . .

WTEN does not allege that plaintiff will use trade secrets or confidential customer information, but relies on the uniqueness of plaintiff's services to justify enforcement of the anti-competition clause. For purposes of assessing plaintiff's likelihood of success, it is worth noting that "unique services" is a very slim reed which has never actually served as the sole basis for judicial enforcement of an anti-competition clause. . . . Although WTEN has alleged that plaintiff will be able to compete with it, it has failed to establish that the competition would be unfair. Although plaintiff has undoubtedly learned a great deal of her craft while first volunteering and then working at WTEN, the station has not demonstrated any inherent unfairness in permitting her to compete with it by appearing on another station after being unable to negotiate a satisfactory new contract with it.

\* \* \*

Assuming that there is some legitimate business interest to the anti-competition clause, WTEN has failed to establish that it is reasonable or necessary for it to require plaintiff to work for half the salary that other television stations would pay her, or leave this area where she was raised and her immediate and extended family still lives, or leave broadcasting. Whatever legitimate business interest that WTEN has is outweighed by the unreasonable injury that its enforcement could inflict on plaintiff. Notwithstanding defendant's argument that plaintiff is not irreparably harmed because she can always leave this area and work elsewhere, plaintiff has established irreparable harm.

The third prong of the test is whether the balance of the equities is in the movant's favor. WTEN concedes that plaintiff more than met its requirements during her years of employment with WTEN. Now, by reason of her unwillingness to accept defendant's offer of employment at an amount far below the market rate, WTEN seeks to render plaintiff unemployable in her area of experience and expertise in this her home region. Defendant's desire to insulate itself from competition, while understandable, is simply not a ground for sustaining a non-competition agreement... . It is not unfair to defendant if television viewers, who value plaintiff's reporting more than defendant does, switch stations along with plaintiff. Such injury to WTEN cannot compare to the unfairness of driving the plaintiff out of work or this region.

17

177 Misc. 2d at 665-67, 676 N.Y.S.2d at 849-50.

Nigra's motion for a preliminary injunction preventing the defendant from enforcing the post-employment restrictive covenant was granted. Assuming this Court were to go beyond the matter raised in Points I and II above, and consider the enforceability of the post-termination restriction, based on New York's public policy and controlling law, as fully set forth in Nigra, CBS's motion to enforce its restrictive covenant as against Jones must be denied.

### Washington, D.C. Law

> "§ 32-532. **Unenforceability of broadcasting industry contract provisions restricting employment after expiration of contract or termination of employment.**
>
> A broadcasting industry employment contract provision that requires an employee or prospective employee to refrain from obtaining similar employment with another broadcasting industry employer following expiration of the contract or upon termination of employment shall be unenforceable."

D.C. Code Ann. § 32-532 (2007)

CBS's efforts to avoid the above-quoted statutory law of Washington, D.C. should be unavailing.

The License Agreement and the personal services contract should, as CBS undoubtedly will urge, be read together. Without the License Agreement, there can be no post-departure restriction. Without the personal service contract, there would be no extant agreement from which to measure the commencement of the post-departure restrictive covenant. Cf. Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 317, 140 N.E. 708, 710 (1923) (absence of a commencement date fatal to employer's attempt to enforce a post-employment restrictive covenant).

The License Agreement (par. 12[h]) designates New York law. New York has no relation to the License Agreement. CBS Radio, the defendant, is a Delaware corporation, with a principal

18

place of business in Maryland.[7]  Radio One is also a Delaware corporation, which has a principal

place of business in Maryland (and which does not broadcast into New York).

Jones, on the other hand, is a lifelong resident of Washington, D.C. who totally performed

his obligations under the agreements from his home in Washington, D.C.  Simply put, New York

has <u>no</u> relation to the agreement, much less a reasonable one.  As such, the choice of law provision

in the License Agreement should not control.  <u>Culbert v. Rols Capital Co.</u>, 184 A.D.2d 612, 613,

585 N.Y.S.2d 67, 68 (2d Dep't 1992) ("while choice of law provisions such as that contained in the

parties' installment note are generally given effect by the courts of this State, such provisions will

not be honored where the jurisdiction whose law is to be applied has no reasonable relation to the

agreement where the enforcement of the provision would . . . .")[8]

In contrast to the License Agreement, paragraph 10 of the personal services contract

provides that "[this Agreement contains the entire understanding between the parties and shall be

construed according to the laws of the Sate of [state]" <u>Sic</u>.  Thus, even were the Court to consider it

appropriate to apply the law of the State of New York to the License Agreement, the "benefits" of

such law would not automatically apply to the personal services contract.[9]  As to such latter

document, there is a clean slate upon which the Court may consider the applicable law.

In such regard, a "federal court sitting in diversity must apply the choice of law rules of

the forum state, in this case New York."  <u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, 108

F.3d 1531, 1538 (2d Cir. 1997).  Under modern New York choice of law, courts seek to apply

---

[7] We were unable to locate a Certificate of Authority for CBS Radio Inc. of Washington, D.C. to do business in New York.  <u>See</u> Addendum B hereto.

[8] Internal citations omitted.

[9] "In cases of ambiguity, a contract is construed most strongly against the party who prepared it, and favorably to a party who has no voice in the selection of language."  <u>Jacobson</u> v. <u>Sassower</u>, 66 N.Y.2d 991, 993, 489 N.E. 2d 1283, 1284 (NY, 1985).

19

the law of the state most interested in or most related to the dispute. _Id_. at 1539. To do this, they employ a "center of gravity" or "grouping of contacts" approach. _Id_. Under this method, courts look to: the place the contract was made; the places where the contract was negotiated and performed; the location of the subject matter; and the domicile or place of business of the parties to the contract. _Id_. (citing In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 227, 613 N.E.2d 936, 940 (N.Y., 1993)). Of all of these factors, those employed by traditional choice of law analysis - - i.e., place where the contract was made and where it was performed -- are given the most weight. Lazard Freres, 108 F.3d at 1539; Madison Realty, Inc. v. Neiss, 253 A.D.2d 482, 484, 676 N.Y.S.2d 672, 674 (App. Div. 2d Dep't, 1998) ("this approach requires traditional choice of law factors to be given 'heavy weight'").

Applying these factors to the instant case, it should be apparent that the District of Columbia has a much stronger interest in the disposition of this case than does the state of New York. It appears the contract was made in the District of Columbia, (Jones Decl., ¶ 6). The contract was clearly entirely performed in D.C. _Id_. at ¶1. Moreover, the subject matter of the contract was Jones, and he is plainly located and domiciled in the District of Columbia. _Id_. at ¶¶ 1, 2. The factors given "heavy weight" all point to the District of Columbia.

New York courts have applied the law of other jurisdictions even where, unlike the situation at bar, there were meaningful contacts to New York. See, e.g., Fanning Technical Search v. 100% Girls Brand Inc., 292 A.D.2d 301, 740 N.Y.S.2d 28 (App. Div. 1st Dep't, 2002) (applying New Jersey law barring unlicensed out-of-State employer-fee-paid employment agencies from pursuing employers for unpaid fees even where contract was partially negotiated and performed in New York). Inasmuch as the negative covenant in the contracts contravenes D.C. Code § 32-532 (2007), it is plain that the policy underlying the District of Columbia statute

20

reflects "readily identifiable and . . . strong governmental interests" that the Court should protect See <u>Lazard Freres</u>, 108 F.3d at 1539 (quoting <u>In re Allstate Ins. Co.</u>, 81 N.Y.2d at 227, 613 N.E.2d at 939).

*    *    *

In sum, were the Court to find the personal services contract to have been validly renewed, and thus determine there is an unexpired post-departure restriction on the use of "Huggy" in the Washington, D.C. radio market, under the laws of both New York and Washington D.C., as presented above, such restrictive covenant is unenforceable. At a minimum, CBS's likelihood of success on the merits is miniscule and the potential harm to Jones far outweighs any potential injury to CBS Radio. After all, this case involves a performer whose worth to CBS was measured, for many years, at less than $500/week. A prohibition against Jones' ability to enjoy the fruits of his compact with Radio One could irreversibly deny Jones his once-in-a-lifetime chance at economic liberation and reward CBS for its attempted use of the restrictive covenant to coerce Jones to remain at WPGC at a compensation far below market.

21

## <u>Conclusion</u>

For all of the foregoing reasons, CBS's application for temporary restraints should be

denied.

Dated:  New York, New York
        July 20, 2007

                              Respectfully submitted,

                              **LEBENSFELD BORKER SUSSMAN &**
                              **SHARON LLP**
                              Attorneys for Plaintiff

                              By:
                                        Stephen Sussman (SS-1072)
                              Two Penn Plaza, Suite 1980
                              New York, New York 10121
                              (212) 594-2030

22